# THE CHARLOTTE.

(District Court, E. D. Virginia. August 11, 1903.)

1. COLLISION—STEAMER AND SCHOONER—EXCESSIVE SPEED IN FOG.

A steamer which entered a dense fog bank on a river at a speed of 10 miles an hour was clearly negligent, and must be held in fault for a collision with a schooner, which resulted.

2. SAME—FOG SIGNALS—WEIGHT OF TESTIMONY.

The testimony of witnesses on a steamer that they heard only a single fog signal from a schooner in a fog, and with which the steamer shortly after came in collision, indicating that she was on the starboard tack, when she was in fact on the port tack, and approaching the course of the steamer, is not sufficient to establish such fact as against the testimony of persons on the schooner, one of whom was disinterested, re-enforced by that of two other disinterested witnesses, who were in the immediate vicinity, that the schooner gave the proper signal of two blasts.

3. DAMAGES—WRONGFUL DEATH.

An award of $1,600 damages, made for the death of a boy 18 years old, leaving infant brothers and sisters in part dependent upon him, and $900 for the death of a boy of 15, leaving only a father, not dependent, is reasonable.

In Admiralty. Suits to recover damages sustained in collision.

Kelly & Edwards, for libelants.

Foster & Foster and Herbert I. Lewis, for respondent.

WADDILL, District Judge. These libels were filed to recover damages arising from the loss of the lives of the libelants' intestates, respectively, in a collision between the respondent's steamship Charlotte and the schooner Annie M. Harris, the causes being heard together by consent of parties, as they depend, so far as the collision is concerned, upon the same state of facts. The Charlotte, an iron screw steam vessel of 1,746 tons register, 1,300 horse power engines, of a speed of some 15 knots per hour, owned by the Chesapeake Steamship Company, of Baltimore City, and plying between the ports of Baltimore, Md., and West Point, Va., and the Annie M. Harris, a two-masted wooden vessel, 27 tons register, some 53 feet in length over all, 18 feet beam, engaged in the oyster business on York river, on the morning of the 30th of August, 1902, about 6:45 o'clock, as each vessel was proceeding up the river, came in collision in a fog, and as a result the schooner was sunk, and the decedents, respectively, both of whom were employed on the Harris as seamen, and the first named also acting as mate, lost their lives.

The faults assigned against the steamship are, briefly, running at too rapid rate of speed in a fog; failure to give proper fog signals; failure properly to slacken her speed, or stop, or reverse, upon approaching the Harris; and the lack of a proper lookout. The faults assigned against the Harris are that she failed to give the proper signals indicating her movements while navigating in the fog, in that she gave only one blast of her horn, indicating that she was on the

¶ 1. Collision rules, speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.

See Collision, vol. 10, Cent. Dig. § 215.

starboard tack, proceeding to the westward, and away from the Charlotte, when in point of fact she was on a port tack, proceeding to the eastward, and across the bow of the Charlotte, without giving two blasts on her horn, indicating such tack.

The faults against the Charlotte will be first considered. The evidence, particularly on the question on which the cases turn, is meager, and much less conflicting than is usual in collision cases. So far as the Charlotte is concerned, the same turns almost entirely upon the speed of the vessel, and, as to the Harris, whether, at the time of the collision, it was giving the port or starboard signals required to be given in a fog. The evidence of the libelants established the fact that there was a very heavy fog on the morning in question, whereas that of the steamship is to the effect that there was considerable fog from Almond's Wharf, some five miles below the scene of the collision, particularly inshore, on both sides of the river, but that in the channel it was not such as to prevent seeing, or that seriously interrupted the navigation of the ship, until about the time of the collision, when a fog bank was entered, extending entirely across the river, and up the river for a very short distance. The evidence of the steamship's master is that he entered this fog bank running at a speed of 10 miles an hour; that he suddenly heard the single blast of the Harris' fog horn on his port bow, and proceeding, as he supposed, on a starboard tack to the westward, when he slowed down, and stopped his engine, and in a little time put his wheel to port, and subsequently reversed, and ordered his engine full speed astern; after which he heard another blast of the fog horn, still indicating, as he supposed, that the vessel was to his port; but in a moment the schooner loomed up across his bow, when it was too late to avert the collision.

The libelants earnestly insist that the steamship, upon hearing the first signal of the Harris in the fog, and which indicated she was apparently half a mile away, should have stopped and reversed her engines until the exact location of the schooner was ascertained, and not have slowed down and ported as was done, and as a result of which the collision occurred. Whatever may be the merits of this contention—and it cannot be said that it is without evidence to support it—it is immaterial in this case, as, in the view taken by the court, it abundantly appears, as well from the pleadings in the cause as the evidence of the respondent, that the steamship was clearly negligent in running into the fog bank at the speed it confessedly did, and as a consequence of which this collision happened. Conceding the condition of the fog to be as claimed by the steamer up to the time of entering the fog bank—certainly before entering it—she should have slowed down. The law on this subject is too well settled to admit of controversy, and its wisdom is apparent to all. The rule requiring vessels to go at a moderate speed in a fog would be of little avail to persons within and closely upon the edge of a fog bank, if other vessels navigating in the clear, and before entering such bank, should proceed at full speed into the same. The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053; The Martello v. The Willey, 153 U. S. 70, 14 Sup. Ct. 723, 38 L. Ed. 637; The Milanese, 4 Asp. 438; The Perkiomen

(D. C.) 27 Fed. 573; The Trave (D. C.) 55 Fed. 117; Hughes, Adm. 227.

The faults assigned against the Harris turn upon whether or not she gave proper fog signals at the time of the collision; the contention being that she gave one signal, indicating she was on her starboard tack, when in fact she was on a port tack, and failed to give the two signals required. This presents a question of fact to be determined by the court from the evidence before it, and the evidence very largely preponderates in favor of the schooner, and the probabilities of the case also coincide with this view. It is true that the master and other witnesses from the steamer, who appeared to be of unusual frankness and fairness, testified with apparent truthfulness that they only heard one signal from the Harris; but two witnesses from the Harris—her master and an uninterested person traveling on the vessel at the time—as well as two other witnesses who were in the immediate vicinity of the accident, all testified that the Harris gave the two signals, indicating that she was on the port tack at the time of the collision. Three of these witnesses were uninterested, and two of them on the vessel, and the others in a better position to hear the signals than the witnesses from the steamer, then under way; and their evidence should be accepted as to whether or not the proper signals were given, their demeanor on the stand being such as to convince the court that they were speaking truthfully. Positive evidence of witnesses who hear a sound or see an object is entitled to greater weight than the negative evidence of persons who failed to see or hear the same. The failure to hear a signal cannot be said to disprove the fact that it was given, and this is strikingly true as to witnesses on board the vessel at the time, who heard the signals given. The Richmond (D. C.) 114 Fed. 208, 211, and cases there cited. It should not lightly be assumed that the navigator of a schooner would proceed under wrong signals at a time when it involved risk of collision, with such serious consequences to himself and those on board his vessel. It follows from what has been said, that the collision resulted solely from the negligence of the Charlotte, and a decree will be entered so determining.

The assessment of damages in these cases is, as usual, a matter of delicacy and difficulty, and one largely in the discretion of the court. In the first-named case, the libelant's intestate was a young white man, 18 years old, of good habits and character, earning $15 per month, and was about to be advanced to $20, having several infant brothers and sisters in part dependent on him for support. In the last-named case the decedent was a colored boy of good habits and character, 15 years of age, and earning $10 per month, his father living, 51 years old. Taking in view all the circumstances of these cases, particularly in the one case that the parties who will receive the benefit are brothers and sisters, and in the other a father, who would be entitled to the earnings of his child only during his minority, an award of $1,600 in behalf of the first-named libelant and of $900 for the last-named libelant is thought to be reasonable, and the same will be accordingly allowed.