# McClure *v.* Lake Shore & Michigan Southern Railway Company, Appellant.

*Negligence—Railroads—"Stop, look and listen"—Grade crossing.*

Where a driver of a team on approaching a railroad grade crossing stops to look and listen for a train at a point where he cannot see trains near the crossing, and then starts and drives directly on, although he could by stopping at a point sixteen feet from the track, have had a clear view of any train which was within a mile of the crossing, and the undisputed evidence is that the horses ran into the side of the train and were killed, the driver is guilty of contributory negligence as a matter of law, and no recovery can be had from the railway company for the loss of the horses.

Argued May 10, 1909. Appeal, No. 208, April T., 1909, by defendant, from judgment of C. P. Mercer Co., April T., 1906, No. 70, on verdict for plaintiff in case of R. D. McClure v. The Lake Shore & Michigan Southern Railway Company. Before RICE, P. J., PORTER, HENDERSON, MORRISON, HEAD and BEAVER, JJ. Reversed.

Trespass to recover damages for the loss of two horses at a grade crossing. Before WILLIAMS, P. J.

The circumstances of the accident are set forth in the opinion of the Superior Court.

Verdict and judgment for plaintiff for $519.60. Defendant appealed.

*Error assigned* was refusal of binding instructions for defendant.

*S. R. Mason*, with him *J. H. Osmer, A. R. Osmer* and *N. F. Osmer*, for appellant.—The appellant respectfully submits that, under the evidence on the part of the plaintiff, the case at bar, upon its facts, is substantially identical with the case of Kinter v. Penna. R. R. Co., 204 Pa., 497, and is ruled by it. See also Hartman v. Harris, 182 Pa. 172; Blotz v. Lehigh Valley R. R. Co., 212 Pa., 154; Myers v. B. & O. R. R. Co., 150

Pa. 386; McKahan v. B. & O. R. R. Co., 223 Pa. 1; Cent. R. R. Co. v. Feller, 84 Pa. 226.

A traveler will not be allowed to say that he looked when the circumstances make it plain that the proper exercise of his senses must have shown him the danger: R. R. Co. v. Feller, 84 Pa. 226; Marland v. R. R. Co., 123 Pa. 487.

*Virgil L. Johnson,* with him *J. R. W. Baker,* for appellee.— Where the plaintiff has stopped, looked and listened, as is the uncontradicted evidence in this case, the question whether he stopped, looked and listened at the particular point where he could best see and hear is for the jury: Cookson v. P. & W. Ry. Co., 179 Pa. 184; Davidson v. Ry. Co., 179 Pa. 227; Summers v. R. R. Co., 24 Pa. Superior Ct. 615; Gray v. Penna. R. R. Co., 172 Pa. 383; Ely v. Ry. Co., 158 Pa. 233; Davidson v. L. S. & M. S. Ry. Co., 171 Pa. 522; Newton v. R. R. Co., 18 Pa. Superior Ct. 18; Ellis v. R. R. Co., 138 Pa. 506; Calhoun v. Penna. R. R. Co., 233 Pa. 298.

We contend that the case at bar is ruled by Schwarz v. D., L. & W. R. R. Co., 211 Pa. 625.

OPINION BY PORTER, J, November 8, 1909.

The plaintiff brought this action to recover damages for the killing of a pair of horses, the destruction of a set of harness and the breaking of the pole of a surrey, which resulted from his team, driven by his employee, coming into collision with an express train of the defendant company, at a grade crossing. The team, in charge of plaintiff's driver, approached the crossing from the north and the express train of the defendant company approached from the west side of the crossing. There was a cut upon the north side of the railroad, and the bank upon that side was, at the point of intersection of the right of way of the defendant company, with the west side of the public road, twelve feet higher than the top of the rail of the track of the defendant company. The public road from the north approached the track through a cut which extended back a considerable distance north from the railroad, through this higher ground on that side. The plaintiff had employed an engineer to make a survey and map of the locality, and that engineer was called as

a witness and testified as to the conditions existing at the time of the accident. This witness, called by the plaintiff, testified that the track of the defendant company west of the crossing was perfectly straight for a long distance, and that at any point in the public road from the track of the defendant company to a point sixteen feet north of the track there was a clear and unobstructed view of the track for at least a mile. There was no dispute under the evidence that from any point in the public road sixteen feet north of the track the view of the track for at least a mile to the westward was entirely free from obstruction; some witnesses for the defendant testified that the track could be seen for fully two miles to the westward and it was so visible from any point in the public road north of the track for a distance considerably exceeding sixteen feet. The engineer who was called as a witness by the plaintiff testified that at a point at the top of the cut on the west side of the public road and twenty-eight feet from the center of the track of the railway the surface of the ground was twelve feet higher than the top of the rail of the track, and over nine feet higher than the surface of the public wagon road at the same distance, twenty-eight feet, north of the center of the track. The cut in the public road extended back north from the railroad track a considerable distance. All the witnesses agree that from a part of this cut a driver seated in a wagon or carriage could not obtain a view of the railroad track west of the crossing, and all of them substantially agreed that the track near the crossing, towards the west, could not be seen after a traveler on the public road had entered the deep part of the cut, although some of the witnesses testified that at some distance north of the railroad, where the surface of the ground on the west was not so high above the bed of the public road and the cuts not so deep, a view of the track could be obtained for a considerable distance to the westward, but not the portion of the track near the crossing. The surface of the ground on the north side of the railroad was higher than the track for a considerable distance west of the crossing, sufficiently higher to cut off trains upon the track for some distance west of the crossing from the view of persons upon the public road at points before that highway en-

tered the cut near the railroad. The cut on the north side of the railroad gradually became less towards the westward, and trains upon this more distant portion of the track were visible from some points upon the public highway more distant from the railroad than the cut through which the public highway descended to the crossing. The plaintiff recovered a verdict in the court below, and the defendant appeals. The only assignment of error is founded upon the refusal of the court to give binding instructions in favor of the defendant, and the only question to be considered is whether the case ought to have been submitted to the jury.

There was a conflict of evidence as to whether the employees of the defendant company had given any signal, by the blowing of whistle or ringing of bell, of the approach of the train to the crossing. Several witnesses for the plaintiff testified that they had, for various reasons, been listening for such signal and that none was given, while a number of witnesses called by the defendant positively testified that they had heard the usual whistle of the locomotive. If this had been the only question involved the case would properly have been left to the jury. The question of the contributory negligence of the agent of the plaintiff, the driver of the team, was, however, squarely raised by the testimony produced by the plaintiff. That evidence established that the night when the accident occurred was dark, but it also established that the headlight of the locomotive drawing the train, with which the team of the plaintiff came into collision, was burning, and that that headlight would have been plainly visible, from a point on the public road sixteen feet north of the track, at all times after the train arrived at a point one mile to the westward of the crossing until it reached the crossing, if persons about to cross the track had stopped and looked for approaching trains. The only witness who saw the accident was the agent of the plaintiff, the driver of the team. He testified that the night was very dark, that he approached the crossing from the north and when he arrived at the cross roads 800 feet from the crossing he stopped, looked and listened for approaching trains, and that from this place where he first stopped he could have seen a train upon the tracks for a dis-

tance of only a quarter of a mile west of the crossing; that, neither hearing nor seeing anything, he proceeded without again looking until he arrived at a point in the public road within 100 feet of the railroad track, that the point where he then stopped was in the cut in the public road. He was not asked in chief whether he could see the railroad track or a train upon it, if there had been one, from that point, but it is significant that in his testimony in chief he did not say that at that point he looked for a train, merely saying that he stopped there and listened. His only testimony as to his opportunities for observation from this point was in cross-examination, as follows: "Q. Could you see down the track then? A. No, sir. Q. Why not? A. There was a bank there on each side; you couldn't see. Q. Was there a bank 100 feet from the track? A. Yes, sir. Q. Wasn't the bank down by the track? A. No; it runs down quite a ways. Q. You say you couldn't see, now, neither up nor down the railroad from the place where you stopped? A. You could see down the track quite a ways, but couldn't see handy to the crossing from where I stopped. Q. You saw nothing and heard nothing? A. No, sir. Q. Did you stop again after you left there until you were struck? A. No, sir." His testimony as to what occurred after he made this stop 100 feet from the track, where according to his own statement he could not see the track nor the crossing, but only "down quite a ways," was thus given in his examination in chief: "Q. Then what did you do? A. I drove on down toward the track, then. Did the train whistle or ring the bell? A. No, sir. Q. What was the next thing, then, that happened? A. The team got struck with the train, at the crossing. Q. How far were you from the track when you first saw the train? A. The horses' heads was about eight or nine feet back from the track, I think, about the length of the team. Q. What did the horses do? A. Well, they just reared up and jumped toward the track, and the train ran on to the crossing. Q. What was the next thing you knew, then? A. The next thing I knowed, I was on the ground, about three or four feet from the track." Upon cross-examination he thus described the accident: "Q. Well, now, you say the horses got down within eight or nine feet of

the track when this train came along there? A. Yes, sir. Q. And they reared up and made a plunge towards the train? A. Yes, sir. Q. Did you try to hold them? A. Yes, sir. Q. And you were thrown out? A. Yes, sir."

The whole duty of one about to cross the tracks of a steam railroad at grade is not in all cases discharged by his stopping, looking and listening for the approach of a train. He must stop at a proper place and when he proceeds he should continue to look and to observe the precautions which the danger of the situation requires. He should stop again if there is another place nearer the tracks from which he can better discern whether there is danger. When the driver of the plaintiff stopped to look and listen for approaching trains at a point 800 feet from the crossing he could, if his own testimony is to be believed, see only such trains as were then within a quarter of a mile of the crossing. It is manifest that this precaution was wholly insufficient; he could not have seen a train which was only twice as far from the crossing as he himself would have to travel before reaching the crossing. The witness testified that he drove slowly. If he drove at the rate of four miles an hour, a train running at forty miles an hour, as trains frequently do in the open country, must have been over a mile and a half from the crossing, at the time he started to drive this 800 feet, in order to reach the crossing at the same time he there arrived. The duty of those about to pass a grade crossing is to look for trains at a time when they may reasonably expect to see a train which may reach the crossing before they have passed over. Having stopped at this long distance from the crossing the driver proceeded without again looking or listening to a point in the cut in the public road where he again stopped, but where according to his own testimony the only part of the track on which he could see a train was quite a distance down and he could not see trains near the crossing. Having stopped at this point where he could not have seen trains with which there was danger of his coming into collision he proceeded without attempting to stop at a point sixteen feet from the track where he could have had a clear view of a train a full mile to the westward. Having stopped at a point where he could not see a train

which might be approaching and near the crossing, it was his duty to proceed cautiously, with his team under control, and again stop at the point, where under the undisputed evidence in the case, his own safety and that of the team required him to stop and look for approaching trains. This driver testified that he was familiar with this crossing, had frequently used it and had resided in the neighborhood. The evidence introduced by the plaintiff disclosed that his agent had stopped to look and listen for trains at a point where he could not see trains near the crossing, and then started and drove directly on, although, under the undisputed evidence, he could by stopping at a point sixteen feet from the track have had a clear view of any train which was within a mile of the crossing. This evidence established the contributory negligence of the plaintiff's agent, and the case is ruled by Central Railroad of New Jersey v. Feller, 84 Pa. 226; Urias v. Penna. R. R. Co., 152 Pa. 326; Myers v. B. & O. R. R. Co., 150 Pa. 386; Corcoran v. Penna. R. R. Co., 203 Pa. 380; Kinter v. Penna. R. R. Co., 204 Pa. 497; Blotz v. Railroad Company, 212 Pa. 154; McKahan v. B. & O. R. R. Co., 223 Pa. 1. This case is strikingly similar in its facts to Blotz v. Railroad Company, supra; in that case as in this the driver stopped at a point from which he had a view of the track for a considerable distance, but could not see 500 feet of the track nearest the crossing, and from that point drove on without again stopping to look or listen until he came into collision with the train, although there was a point near the track, in that case fifteen or twenty feet from the track, from which the track might have been seen for several hundred feet, a much less extended view than that which the driver would have had in the present case. It was there held that by stopping at a point from which he could not see a train near the crossing, he was not relieved from all further legal duty of care, and that the question was for the court. "That he exercised no precaution when near the track is manifest from the fact that he could have seen the train and that he was struck by the side of the engine. These circumstances connected with the accident amount to evidence that admits of no conclusion except that he either did not look or that he went on in the presence of mani-

fest danger, and the case comes within the rule established by Carroll v. Penna. R. R. Co., 12 W. N. C. 348."

The employee of the plaintiff, the only witness who testified that he saw the accident, did not undertake to say that the team had reached the crossing before it was struck by the engine. He testified that when the horses' heads were eight or nine feet from the track he first saw the train, that the horses reared and jumped towards the track or, as he said in cross-examination, towards the train; that the train ran on to the crossing and the next thing he knew he was out of the surrey in which he had been seated. Undisputed evidence of a number of witnesses established that after the accident the surrey remained standing in the road with its hind wheels almost in the wagon tracks of the public road and the front wheels turned slightly to the eastward, and the only injury to the surrey was that the point of the pole was broken. The horses were both killed, but the body of one was found in the public road and that of the other a few feet to the east of it, both upon the north side of the railroad track. All the evidence for the plaintiff indicated that the horses had run into the side of the train, and this was corroborated by the testimony of the employees of the defendant and the marks found on the side of the tender, baggage car and smoking car of the train. Four absolutely disinterested witnesses testified that immediately after the accident the driver had declared that the horses had taken fright near a point where there was a bend in the public road, about 175 feet from the track, and had run off, that he could not control them and that they ran into the side of the train. The driver, it is true, denied that he had made any such declarations as these, and the case might have had to go to the jury if the evidence produced by the plaintiff had presented a case which did not of itself disclose the contributory negligence of his driver. The cases, however, in which a railroad company can be called upon to pay for runaway teams which dash against the sides of its cars, merely because the trains fail to get over a crossing and out of the way before the runaway horses reach it, must certainly remain exceptional.

The judgment is reversed.